# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 03, 2020

Ms. Beth A. Andrews
Mr. Roger A. Smith
Vandeveer Garzia
840 W. Long Lake Road
Suite 600
Troy, MI 48098

Ms. Huwaida Arraf
Mr. William H. Goodman
Ms. Julie H. Hurwitz
Goodman, Hurwitz & James
1394 E. Jefferson Avenue
Detroit, MI 48207

Mr. Steven T. Budaj
Law Office
65 Cadillac Square
Suite 2915
Detroit, MI 48226

Ms. Marcelyn A. Stepanski
Rosati, Schultz, Joppich & Amtsbuechler
27555 Executive Drive, Suite 250
Farmington Hills, MI 48331

Re:  Case Nos. 18-1305/18-1307, *Anthony Hart v. Hillsdale County, MI, et al*
Originating Case No. : 2:16-cv-10253

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0291p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

ANTHONY HART,

　　　　　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

HILLSDALE COUNTY, MICHIGAN, KWINN LEVA,
TIMOTHY PARKER, and CHRISTINE WAHTOLA
(18-1305); CITY OF HILLSDALE, SHELBY RATHBUN,
and TODD HOLTZ (18-1307),

　　　　　　　　　　　　*Defendants-Appellants.*

Nos. 18-1305/1307

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:16-cv-10253—Denise Page Hood, Chief District Judge.

Argued:  May 7, 2019

Decided and Filed:  September 3, 2020

Before:  COLE, Chief Judge; STRANCH and READLER, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:**  Marcelyn A. Stepanski, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellants in 18-1305.  Roger A. Smith, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellants in 18-1307.  William H. Goodman, GOODMAN, HURWITZ & JAMES, P.C., Detroit, Michigan, for Appellee.  **ON BRIEF:**  Marcelyn A. Stepanski, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellants in 18-1305. Roger A. Smith, Beth A. Andrews, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellants in 18-1307.  William H. Goodman, Huwaida Arraf, Julie H. Hurwitz, GOODMAN, HURWITZ & JAMES, P.C., Detroit, Michigan, Steven T. Budaj, STEVEN T. BUDAJ, P.C., Detroit, Michigan, for Appellee.

　　　STRANCH, J., delivered the opinion of the court in which COLE, C.J., joined. READLER, J. (pp. 24–37), delivered a separate dissenting opinion.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge.  In 2011, Michigan narrowed the crimes covered by the Sex Offender Registration Act (SORA) making Anthony Hart no longer a "sex offender." Defendants required him to continue registering as one, and he did.  In July 2013, he registered an incorrect address and, in January 2014, failed to update his address.  Defendants arrested Hart each time, using warrant requests incorrectly representing that he was required to register under SORA.  The first time, Hart spent the night in jail; the second time, he served 19 months in prison.  When prison officials finally realized the mistake, they released Hart and his convictions were vacated.  Hart then sued for false arrest, malicious prosecution, and defamation.  Five Defendants, employees of the city police and county sheriff's departments, moved to dismiss the suit based on qualified immunity.  The district court denied the motion and, for the reasons explained below, we **AFFIRM IN PART** and **REVERSE IN PART**.

## I.  BACKGROUND

### A.  Sex Offender Registration

Michigan's SORA labels as sex offenders certain categories of criminal defendants.  That designation is not appealable and sometimes applies "to those whose offenses would not ordinarily be considered sex offenses."  *Does #1–5 v. Snyder*, 834 F.3d 696, 703 (6th Cir. 2016) (citing the example of a defendant's non-sexual kidnapping offense).  The Act mandates that all sex offenders register with government officials; the length of time depends on the severity of the underlying offense:  15 years for a Tier I offender, 25 years for Tier II, and life for Tier III. *See* Mich. Comp. Laws § 28.725(10)–(12).

During that period, registrants are subject to significant conditions, such as a prohibition on living, working, or "loitering" within 1,000 feet of school property.  *See id.* §§ 28.733(f), 28.734(1), 28.735(1).  They must report in person to a law enforcement office "whenever they change residences, change employment, enroll (or unenroll) as a student, change their name, register a new email address or other 'internet identifier,' wish to travel for more than seven

days, or buy or begin to use a vehicle (or cease to own or use a vehicle)." *Snyder*, 834 F.3d at 698 (citing Mich. Comp. Laws §§ 28.722(g), 725(1)).

The information from those periodic reports is compiled into two databases, one freely accessible online. There, any member of the public may view the registrant's photograph, name, birthday, address, employer, school, license plate number, and offense of conviction. *See* Mich. Comp. Laws § 28.728(2). The private law enforcement database adds the registrant's social security number, telephone numbers, email addresses, driver's license number, professional licenses, fingerprints, and complete criminal history. *See id.* § 28.728(1).

SORA distributes responsibilities related to registrations and the databases among different law enforcement agencies. The registrant reports in person to the local "registering authority." *See id.* § 28.725(1). For a registrant who lives in Michigan, the registering authority is "the local law enforcement agency or sheriff's office having jurisdiction over the individual's residence, place of employment, or institution of higher learning." *Id.* § 28.722(n). Registering authorities may designate a point person—a "registration official"—to receive and process the in-person reports. The registration official transmits the gathered information to the Michigan State Police (MSP), which maintains both the law enforcement database and the public website. *Id.* § 28.727(1), 28.728(1)–(2); *see also id.* § 28.722(d). As part of its maintenance responsibility, the MSP removes registrants from both databases if it "determines that an individual has completed his or her registration period, including a registration period reduced by law under [the 2011 SORA amendments], or that he or she otherwise is no longer required to register." *Id.* § 28.728(9).

If an offender fails to comply with SORA's registration requirements—for example, by missing a periodic check-in or failing to update a changed address—the MSP is required to "notify all registering authorities as provided in [§ 28.728a] and initiate enforcement action as set forth in that section." *Id.* § 28.725a. The cross-referenced subsection, however, makes clear that the registering authorities need not wait for such notification:

> If an individual fails to register or to update his or her registration information as required under this act, *the local law enforcement agency, sheriff's office, or department post* responsible for registering the individual or for verifying and

updating his or her registration information *shall* do all of the following *immediately* after the date the individual was required to register or to update his or her registration information:

> (a) Determine whether the individual has absconded or is otherwise unlocatable.
>
> (b) If the registering authority was notified by a registration jurisdiction that the individual was to appear in order to register or update his or her registration information in the jurisdiction of the registering authority, notify the department in a manner prescribed by the department that the individual failed to appear as required.
>
> (c) Revise the information in the registry to reflect that the individual has absconded or is otherwise unlocatable.
>
> (d) *Seek a warrant for the individual's arrest if the legal requirements for obtaining a warrant are satisfied.*
>
> (e) Enter the individual into the national crime information center wanted person file if the requirements for entering information into that file are met.

*Id.* § 28.728a(1) (emphasis added); *see also id.* § 28.722(g) (defining "immediately" as "within 3 business days").

Willful violation of SORA's registration requirements is a felony. *Id.* § 28.729(1). A first offense is punishable by up to four years' imprisonment and a $2,000 fine; by the third offense, potential sanctions increase to ten years and $10,000. *Id.*

In 2011, the Michigan legislature amended SORA, changing the definition of "convicted." *See* 2011 Mich. Pub. Acts 17. Under the new definition, an individual who was tried as a juvenile was "convicted" only if "[t]he individual was 14 years of age or older at the time of the offense" and was classified as a "tier III offender." Mich. Comp. Laws § 28.722(b)(iii). Because individuals are only "offenders" under the Act if they have been "convicted" of violating certain statutes, *see id.* § 28.722(r)–(w), this new definition removed the sex offender mantle from juvenile offenders convicted of tier I or tier II offenses.

Hart, a registered sex offender for many years, was one such former juvenile offender.[1] Because he had been designated a tier II offender after his juvenile court hearing, he should have been removed from the databases following the 2011 amendments. Hart was never notified that he was no longer required to register and should have been removed from the registry, so he continued to report to his local registering authority.

Hart alleges that in March 2012 Defendant Christine Wahtola (a registration official at the county sheriff's department) told him that he was required to register. He did so and, because he was homeless, reported a series of temporary addresses over the next year. In July 2013, he changed his address again, reporting that he was living in a treehouse in the backyard of 79 Budlong Street. Defendant Kwinn Leva (another county registration official) told Defendant Lieutenant Timothy Parker about the change. Parker went to the address; Hart was not there. When Parker located Hart, Hart explained that he was living behind the house across the street, number 76. Parker arrested Hart for violating SORA, took him to the county jail, and then applied for and received an arrest warrant. Hart spent the night in jail. A month later, on the advice of his attorney, Hart pleaded no contest to the SORA violation, was found guilty, and was assessed a $325 fine.

In December 2013, Leva registered Hart again. The next month, Parker told Defendants Shelby Rathbun and Todd Holtz that Hart had failed to verify his address; they then tried to locate Hart. Hart, upon learning about their attempts, voluntarily appeared at the sheriff's office and was arrested. On January 24, 2014, after Hart was in jail, Rathbun requested an arrest warrant. On February 10, Defendant Marci Kelley sent Rathbun a copy of Hart's certified sex offender registration record. A few weeks later, again on the advice of counsel, Hart pleaded guilty to the charged SORA violation. He was sentenced to 16 to 24 months' imprisonment and ordered to pay $1,027.

---

[1]In this recitation of the facts, we accept as true the facts alleged in Hart's complaint. *See Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). We also consider "exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.* Certain documents produced by Defendants, including the Certified Record transmitted by the MSP, and Defendants' warrant requests, fall within this rule. We do not rely on exhibits containing Defendants' subjective descriptions of events (for example, officers' incident reports) unless Hart asks us to do so.

After Hart had served 19 months of that sentence, an official at the Michigan Department of Corrections realized the error and notified the MSP. Kelley confirmed that, in light of the 2011 amendments, Hart had not been required to register at the time of either conviction. Hart was released from prison in August 2015, and both of his convictions were vacated.

**B. Procedural History**

Hart filed suit under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments. Four groups of defendants are relevant to the present appeal: (1) Wahtola, Leva, and Parker, who work for the county sheriff's department (the County Defendants); (2) Rathbun and Holtz, who work for the city police department (the City Defendants); (3) Kelley and Melissa Marinoff, who work for the MSP (the State Defendants); and (4) Hillsdale County and the City of Hillsdale (the Municipal Defendants).[2]

Early in the proceedings, the district court granted the State Defendants' motion to dismiss, reasoning that the MSP employees were not personally involved in arresting or prosecuting Hart and that Hart had not identified deliberate falsehoods or reckless disregard for the truth on their part. The case proceeded against the City, County, and Municipal Defendants. The City and County Defendants moved for qualified immunity on the basis that they relied on the dismissed State Defendants to provide accurate information in the databases. The district court denied the motions, reasoning that Hart had alleged deliberate or reckless falsehoods by the City and County Defendants and that his right to be free from arrest and prosecution in the absence of probable cause was clearly established. The court also concluded that Hart had adequately alleged a failure to train claim against the Municipal Defendants. The City, County, and Municipal Defendants timely filed notices of appeal. The district court then granted Hart's motion to reconsider the dismissal of the State Defendants. The State Defendants did not appeal.

---

[2]Hart also sued Watch Systems, LLC, the contractor that provides and maintains software for the SORA database; his defense attorney; and the attorney's firm. The parties stipulated to dismissal of the claims against the attorney and firm. Proceedings against Watch Systems are ongoing in the district court.

## II. ANALYSIS

We review de novo a district court's denial of a motion to dismiss invoking qualified immunity. *Coley v. Lucas County*, 799 F.3d 530, 536 (6th Cir. 2015). Although orders denying motions to dismiss are generally not "final decisions" reviewable under 28 U.S.C. § 1291, we recognize an exception for orders denying qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "[T]his exception is a narrow one. A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on 'neat abstract issues of law.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).

As we have repeatedly cautioned, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (brackets and citation omitted) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)); *see also Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019); *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). "[I]t is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds" because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law. *Singleton v. Kentucky*, 843 F.3d 238, 242 (6th Cir. 2016).

To defeat a claim of qualified immunity, the plaintiff must show that the official's conduct (1) violated a constitutional right that (2) was clearly established. *See Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019). As with any other motion to dismiss, we perform this analysis while accepting the plaintiff's factual allegations as true and drawing all reasonable inferences in his favor. *See Courtright*, 839 F.3d at 518. We ask only whether, "reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Cahoo*, 912 F.3d at 899 (quoting *Courtright*, 839 F.3d at 518). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. False Arrest

We begin with Hart's false arrest claim against the City and County Defendants. "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). If the arrest is made pursuant to a facially valid warrant, liability is proper only if the defendant "'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood' and 'such statements or omissions were material, or necessary, to the finding of probable cause.'" *Id.* (brackets omitted) (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)).

Hart does not dispute that Parker and Rathbun applied for and received facially valid warrants for his two arrests and does not challenge the timing of the applications. He argues that, under *Sykes*, the warrant requests include material false statements and omissions. Hart alleges that the first time he was arrested, Parker submitted a warrant request asserting that Hart "was required to register as a sex offender and failed to appropriately do so." The one-page warrant request in the record does not include this statement but does request a felony charge for a sex offender registry violation. The second time Hart was arrested, Rathbun and Holtz allegedly submitted a request asserting that Hart "fail[ed] to comply with reporting duties" and "fail[ed] to comply with [the] registration act." Once again, the one-page request—submitted by Rathbun only—does not include this statement but does request felony charges under SORA.

The only reasonable inference to be drawn from these requests for SORA charges is that Hart was an "offender" subject to SORA's requirements. He was not—a material fact that was omitted from both warrant requests. If the officers had revealed that Hart was under no obligation to register, there would have been no basis to charge him with violating an inapplicable statute and no probable cause. *See Sykes*, 625 F.3d at 305 ("If the affidavit contains false statements or material omissions, we set aside the statements and include the information

omitted in order to determine whether the affidavit is still sufficient to establish probable cause.").**[3]**

      1.  <u>Deliberate or Reckless Conduct</u>

      We therefore must determine whether Hart has plausibly alleged that the misstatements or omissions were made "knowingly and deliberately, or with a reckless disregard for the truth." *Id.* (citation omitted).  In assessing the Defendants' degree of fault, we note that our court is rarely the appropriate forum in which to resolve factual disputes regarding intent—especially on a motion to dismiss. *See United States v. Bonds*, 12 F.3d 540, 568–69 (6th Cir. 1993) ("We review for clear error the conclusions of the district court as to reckless disregard for the truth and intent to deceive, since these are issues of fact that reflect the affiant's credibility.").

      First, we consider the possibility of deliberate action.  But Hart's only allegations regarding deliberate or intentional behavior are the bare assertions that Defendants behaved deliberately.  We are not required to accept these unadorned legal conclusions as true. *See Iqbal*, 556 U.S. at 679; *see also Mills v. Barnard*, 869 F.3d 473, 481 (6th Cir. 2017) ("To be sure, the plain statement that Jenkins 'intentionally, maliciously, or with reckless disregard' subjected Mills to malicious prosecution is insufficient standing on its own." (brackets and ellipsis omitted)).  In the absence of factual allegations creating an inference that one or more of the Defendants knew Hart was not required to register and ignored that fact, Hart has not plausibly alleged deliberate misconduct.

      We also consider the possibility, urged by Defendants, that their behavior was objectively reasonable.  In a case involving an ambiguously worded statute that had never been construed by

---

**[3]**The Dissent's reliance on the unpublished case *Sinclair v. Lauderdale County*, 652 F. App'x 429 (6th Cir. 2016), is misplaced.  Though both cases involved inapplicable state statutes, the *Sinclair* court found probable cause to arrest the plaintiff despite the sheriff's reliance on both a mistake of fact and a mistake of law "[g]iven the other probative evidence carrying the full weight of legal authority." *Id.* at 435.  We determined that a "Consent Order, signed by the circuit judge," authorized the "escape" charge and the program's letter established "the triggering event in the Consent Order." *Id.*  The dissent incorrectly concludes that Ms. Sinclair was not subject to the Consent Order—the Order "explicitly mandated" her responsibility for her son's transportation, *id.* at 437—so it is true that no comparable authority is present in this case.  This record contains no consent order judicially authorizing a legally enforceable agreement of the parties or other authority that would support a finding of probable cause that Hart was breaking the law or show that the officers made a comparable, reasonable mistake of law.  The officers relied solely on the database, and the law is clear that Hart was no longer required to register as a sex offender and thus was not breaking the law.

the state's higher courts, the Supreme Court instructed that an officer's reasonable mistake of law entitled him to qualified immunity. *See Heien v. North Carolina*, 574 U.S. 54, 68 (2014). But, the Court cautioned, this rule "does not discourage officers from learning the law" because "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable." *Id.* at 66. No objectively reasonable reading of SORA includes Hart within its scope. SORA is long, but it is perfectly clear. Juvenile offenders are required to register only if two requirements are met: "[t]he individual was 14 years of age or older at the time of the offense" and he was categorized as a "tier III offender." Mich. Comp. Laws § 28.722(b)(iii). There is no objectively reasonable argument that Hart, a tier II juvenile offender, is covered by this language.

We turn to recklessness. Officers' misrepresentations cannot support a § 1983 claim when they exhibit only "negligence or perhaps a lack of attention to detail." *Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014). Our caselaw provides instructive examples of the distinction between negligence and recklessness. For example, when two officers had different recollections about an interview (one "remember[ed] Masters being more specific, giving a 5:00 p.m. approximation," and the other "remember[ed] him being more vague"), relying on the memory of just one officer demonstrated "at worst" negligence. *See id.* On the other hand, omitting evidence casting doubt on the accusations of a lone child witness "demonstrate[s] 'deliberateness' or a 'reckless disregard for the truth,' given that any reasonable officer would have recognized the importance of [the child's] reliability on the question of probable cause." *Wesley*, 779 F.3d at 433 (brackets omitted). As a middle ground, where the police obtained a warrant to search a house that only partially matched an informant's description, we held that "[i]t is up to a jury, not a judge, to decide whether [certain architectural details] are such salient features that they would make it less than reckless to select the house that exhibited them." *Hill v. McIntyre*, 884 F.2d 271, 276 (6th Cir. 1989).

In this case, the City and County Defendants argue that they could not have been reckless because they were entitled to rely on the MSP and the database the MSP maintained. In analyzing this argument, we draw all reasonable inferences in favor of Hart and against the City and County Defendants. For ongoing proceedings against the State Defendants, the district court

may draw different inferences as warranted, leaving the fact finder to decide which inferences are correct. The Supreme Court clarified decades ago that one law enforcement agency may rely on another agency's statement that they have a warrant or "a reasonable suspicion of involvement with a crime." *United States v. Hensley*, 469 U.S. 221, 231 (1985); *see also Whiteley v. Warden*, 401 U.S. 560, 568 (1971). But here, there is no indication that an MSP employee prompted this arrest by telling one of the City or County Defendants that Hart was subject to SORA and had violated its registration requirements. The only MSP communication referenced in the complaint is the transmittal of Hart's Certified Record on February 10, 2014. The City and County Defendants could not have relied on that to arrest Hart because the arrests had already taken place on January 23, and six months before that, in July 2013. There is no basis to conclude, at this stage of the proceedings, that the City and County Defendants were relying on MSP's affirmative representations.

Instead, the officers paint Hart's continued inclusion in the databases as an indirect representation by the MSP. SORA requires the MSP to remove a registrant from the law enforcement database "[i]f the [MSP] determines that [the] individual has completed his or her registration period, including a registration period reduced by law under [the 2011 amendments to SORA]." Mich. Comp. Laws § 28.728(9). In light of this statutory responsibility, the City and County Defendants argue that their actions in reliance on the database could not have been reckless.

At the motion to dismiss stage, we may not draw that inference against Hart unless it is the only plausible conclusion that can be reached on these facts. *See Iqbal*, 556 U.S. at 682. Three considerations counsel against that result here. First, the complaint does not describe how (or, indeed, whether) the MSP complies with its statutory duty to maintain an accurate database. At this stage, we cannot assume that legal requirements were satisfied merely because they exist, and we do not know what the City and County Defendants knew at the time they relied on the

database. Without this factual background, we cannot decide as a matter of law whether an officer was reckless to rely on the database without independently verifying its results.[4]

Second, SORA excuses anyone who "is homeless or otherwise lacks a fixed or temporary residence," from the duty to register an exact address. Mich. Comp. Laws § 28.722(p). A homeless registrant need only provide to the authorities "the village, city, or township where the person spends a majority of his or her time." *Id.* Hart was "effectively homeless" at the time of his July 2013 arrest, living in a treehouse in a backyard. And during the period before the second arrest, he bounced back and forth among six different addresses in Hillsdale, in addition to a stint with no address at all. Because the authorities apparently always knew "the village, city, or township" where Hart lived (Hillsdale), *see id.*, a reasonable officer might plausibly have concluded that Hart was homeless and so had not violated SORA, despite his inclusion in the database.

Third, Michigan law does not seem to permit unconsidered reliance on the database. The provision of SORA giving local law enforcement the authority to enforce the Act comes with a caveat: the local agency is charged with "[s]eek[ing] a warrant for the individual's arrest *if the legal requirements for obtaining a warrant are satisfied*." Mich. Comp. Laws § 28.728a(1)(d) (emphasis added). This cautionary language has meaning, and we may not fail to "give effect to every word, phrase, and clause in a statute." *State Farm Fire & Cas. Co. v. Old Republic Ins. Co.*, 644 N.W.2d 715, 717 (Mich. 2002). Thus, SORA contemplates an independent obligation on the part of enforcing officers to check for satisfaction of SORA's requirements prior to arrest.

Defendants submit, however, that even a diligent check would not have caught this mistake because the Certified Record incorrectly lists Hart's conviction type as "Michigan Adult," showing the 2011 amendments for juvenile offenses to be inapplicable. But once again,

---

[4]As the Dissent points out, and Hart's counsel conceded at argument, Hart does not allege that there was a history of errors by the MSP to maintain the database or that the database was commonly known to be inaccurate. As our case law makes clear, however, "[a] complaint need not set down in detail all the particularities of a plaintiff's claim against the defendant." *Dunn v. State of Tenn.*, 697 F.2d 121, 125 (6th Cir. 1982). There is no dispute that Hart alleges a claim for false arrest, a claim that legally may depend on whether the actions of the officers were reckless. What the officers knew or were aware of regarding the database is relevant to the issue of recklessness, and at this stage, unknown. The dissent is incorrect in concluding that recognition of the legal components of a claim pled constitutes rewriting the complaint.

reaching that conclusion requires drawing inferences that are neither grounded in Hart's complaint nor favorable to him. We do not know what the officers knew about the database or mistakes in it that might affect the need for external confirmation of its results to avoid recklessness. Indeed, Hart's own record contains at least three mistakes: in addition to listing his conviction as an adult matter, his date of conviction is blank, in violation of Mich. Comp. Laws § 28.728(1)(w), and his registration end date (in 2054) is decades beyond the 25-year period appropriate for a tier II offender, *see id.* § 28.725(11). We do not even know whether the information we see in the Certified Record is the same information that would have appeared when an officer looked Hart up in the database at the time of his two arrests.

Taking the facts in the light most favorable to Hart, a reasonable officer could not believe that Hart was subject to SORA's requirements based solely on his inclusion in the database. That reasonable officer, aware that the database can contain erroneous registrations and seeing apparent mistakes in Hart's record, would have followed the statutory directive to determine whether "the legal requirements for obtaining a warrant [were] satisfied," *id.* § 28.728a(1)(d), including whether Hart's failure to register was excused by his homelessness. The City and County Defendants did not do so, even though they had both the time and all the necessary information available.

Because "any reasonable officer would have known that [Hart's satisfaction of SORA's legal requirements] would be 'the kind of thing the judge would wish to know,'" *Wesley*, 779 F.3d at 433 (quoting *Peet v. City of Detroit*, 502 F.3d 557, 570 n.3 (6th Cir. 2007)), Hart has plausibly alleged that the Defendants behaved recklessly by incorrectly representing in their warrant applications that he was subject to SORA's restrictions. We leave it to the court at summary judgment or the factfinder at trial to resolve the factual question of whether the steps Defendants skipped and the problems they overlooked were serious enough to allow an inference of recklessness. *See Hill*, 884 F.2d at 276.[5]

---

[5]We also note that the Dissent's reliance on *Sinclair* is inappropriate because it was decided at the summary judgment stage, after all the facts and relevant circumstances were explored through discovery. The *Sinclair* court made clear that "[t]he probability of criminal activity is assessed under a standard of reasonableness and is 'based on an examination of all facts and circumstances *within an officer's knowledge at the time of the arrest.*'" Sinclair, 652 F. App'x at 434 (emphasis in original) (quoting *Green v. Throckmorton*, 681 F.3d 853, 865

### 2. Culpability of Individual Defendants

We began with these Defendants as a group, but "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). At issue is whether Hart has plausibly alleged unconstitutional conduct by each of the City and County Defendants.

We have developed frameworks to analyze policework conducted, as in this case, in teams. Officers may stop (and arrest) individuals only if certain preconditions are met: "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *United States v. Lyons*, 687 F.3d 754, 767 (6th Cir. 2012) (citing *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010)). At this stage of the litigation, much of the necessary information is lacking.

According to the complaint, Parker (County), Rathbun, and Holtz (both City) bear responsibility because they conducted the two arrests. All three argue that they relied on the MSP—but, as noted, they acted without affirmative instruction from the MSP, and their unexplained reliance on the MSP's database must at this stage be considered reckless. Rathbun and Holtz add that they also relied on Parker's assertion that Hart "had failed to verify his address."[6] But the Act instructs officers to pursue arrests only "if the legal requirements for obtaining a warrant are satisfied." Mich. Comp. Laws § 28.728a. Parker's statement that Hart had not verified his address does not itself satisfy those legal requirements; nothing in the complaint hints that Hart was unaffected by the 2011 amendments or that he was not homeless. At this stage, we may not assume that Rathbun and Holtz were excused from responsibility for verifying these critical facts.

---

(6th Cir. 2012)). At the motion to dismiss stage, we do not know enough about the officers' knowledge at the time of Hart's arrest to determine, as a matter of law, whether the officers were reckless in relying solely on the database.

[6]Holtz also argues that he was not involved in Hart's arrest. We do not consider his assertion at this stage of the proceedings, as it contradicts the complaint.

This leads us to County Defendants Wahtola and Leva, the two named "registration officials" under SORA. That title implies a thorough grounding in SORA. It is plausible that once Wahtola or Leva enters someone into the system, other officers reasonably assume that the necessary background work has been completed. It is also plausible that Wahtola or Leva, as registration officials, categorized Hart's conviction as "Adult," introducing the error upon which other officers relied. *See* Mich. Comp. Laws § 28.727 (explaining the process by which local registration authorities collect information and forward it to the MSP). Though Wahtola and Leva are the most removed from the arrests, their position may indicate that they are the ones who should have "ha[d] facts supporting the level of suspicion required." *Lyons*, 687 F.3d at 767.

Attempting to pull apart the web of reliance at the motion to dismiss stage is impossible. The district court tried to winnow the pool of responsible defendants early in the proceedings but ended up reversing its dismissal of the State Defendants because the City and County Defendants argued that the responsibility lay with them. Winnowing the defendants is not possible until an evidentiary record is developed.

### 3. Clearly Established Law

Defendants submit that Hart's false arrest claim nonetheless fails at the second step of the qualified immunity analysis because "the right at issue was [not] 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Wesley*, 779 F.3d at 428 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)).

A recent Supreme Court qualified immunity case, decided at summary judgment, addressed whether officers who observed a raucous party in a home had probable cause to believe the partygoers were trespassing. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 585–86 (2018). Regarding the clearly established prong, the Court emphasized that "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply" and that "the legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. The Court acknowledged that

"there does not have to be 'a case directly on point'" and that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," but cautioned that "'a body of relevant case law' is usually necessary to 'clearly establish the answer' with respect to probable cause." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Turning to the facts of the case before it, the Court explained:

> We start by "defining the circumstances with which the officers were confronted." The officers found a group of people in a house that the neighbors had identified as vacant, that appeared to be vacant, and that the partygoers were treating as vacant. The group scattered, and some hid, at the sight of law enforcement. Their explanations for being at the house were full of holes. The source of their claimed invitation admitted that she had no right to be in the house, and the owner confirmed that fact.
>
> Even assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they "reasonably but mistakenly concluded that probable cause was present." Tellingly, neither the panel majority nor the partygoers have identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation "under similar circumstances." And it should go without saying that this is not an "obvious case" where "a body of relevant case law" is not needed. The officers were thus entitled to qualified immunity.

*Id.* at 590–91 (brackets and citations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987); *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Brosseau*, 543 U.S. at 199).

This summary judgment precedent demonstrates why this case cannot be resolved on a motion to dismiss. The "circumstances with which the officers were confronted" are unknown. Was the information that appeared when the officers looked Hart up on the dates of the arrests the same information we now see in his Certified Record? Were the arresting officers relying on a well-curated database that had been appropriately reviewed after the 2011 amendments, or one they were aware might contain mistakes? Were the instigating officials trained in SORA's intricacies? Should Hart have been excused from registering because he was homeless? Would a reasonably well-trained officer looking at Hart's printout immediately notice its mistakes?

We do not know, and so we must assume at this stage that these questions are answered in Hart's favor.

It is settled law in this circuit that an officer may not arrest and prosecute based solely on an unreliable source. Thus, for example, "uncorroborated allegations" by an eyewitness do not establish probable cause unless the allegations are "reasonably trustworthy." *Wesley*, 779 F.3d at 429 (quoting *Logsdon v. Hains*, 492 F.3d 334, 342 (6th Cir. 2007)). "Put another way, the presumption of veracity applies only where the witness is 'someone with respect to whom there is *no* apparent reason to question the person's reliability.'" *Id.* at 430 (quoting *Logsdon*, 492 F.3d at 343). In this, an eyewitness and a database are no different. If the officers had reason to question the database's reliability or if a reasonably well-trained officer would have caught its error immediately, then it was clearly established that the officers could not rely exclusively on that database to establish probable cause.

To the extent the officers argue that they are entitled to qualified immunity because they were "simply following orders," we rejected that argument in *Bunkley v. City of Detroit*, 902 F.3d 552, 562 (6th Cir. 2018). There, as here, the officers who claimed to be following orders made mistakes of their own. They "assumed that Bunkley and his father were the Ainsworth shooters, even though neither fit Ainsworth's description (other than their both being African-American and Bunkley's wearing black clothing); they did not investigate the Knox shooting; and they did not even question Bunkley about the Ainsworth shooting before arresting him." *Id.* at 562. The City and County Defendants here similarly failed to perform any investigation or ask any questions that could have confirmed whether Hart was required to register even though, drawing all inferences in Hart's favor, Defendants were statutorily mandated to ask those questions, were on notice of the risk of error, and were aware of the materially different requirements for homeless offenders.[7]

---

[7]The Dissent argues that *Bunkley* is distinguishable because Bunkley's innocence was "readily apparent," whereas Hart's innocence depended upon "the SOR entries (one of a host of items possessed by the officers)" along with actions based on other information. **(Dissent at 11–13)** That argument fails for two reasons. First, *Bunkley* is cited for the legal proposition that officers are not entitled to qualified immunity because they were "simply following orders." 902 F.3d at 562. More importantly, *Bunkley* was decided on summary judgment, and affirmed the district court's denial of qualified immunity on interlocutory appeal because disputes of material fact remained. This case is an appeal from denial of a motion to dismiss. Here, we do not know what the officers knew prior to

The Supreme Court has instructed that, in performing Fourth Amendment qualified immunity analysis, we must confine ourselves to "the situation [the officer] confronted," carefully considering the "particular factual context[]" at issue. *Wesby*, 138 S. Ct. at 590. That is hard to accomplish at the motion to dismiss stage. "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not." *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring). On the false arrest claims, Hart has plausibly alleged a violation of his clearly established constitutional rights. Remand for factual development is necessary.

**B. Malicious Prosecution**

The analysis of Hart's malicious prosecution claim proceeds on a parallel course. A malicious prosecution claim has four elements:

> (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant 'made, influenced, or participated in the decision to prosecute'"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, 'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty' apart from the initial seizure"; and (4) that "the criminal proceeding must have been resolved in the plaintiff's favor."

*Mills*, 869 F.3d at 480 (alterations and brackets omitted) (quoting *Sykes*, 625 F.3d at 308–09). And while a showing of malice is unnecessary, the defendant's conduct "must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). Recklessness meets this standard. *Id.*

The third and fourth elements are not in dispute. The first time Hart was arrested, he was jailed overnight; the second time, he was imprisoned for 19 months. Both convictions were eventually vacated.

Turning to the second element, the probable cause for the prosecution depended on the incorrect belief that Hart was obligated to register under SORA. As with the false arrest claim,

---

Hart's arrest or if they had reason to investigate further before incarcerating him. At the stage of this case, we lack the necessary factual context to determine whether reliance on the database without more was reckless.

an officer defending against a malicious prosecution claim cannot "rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations," including via "omission of material facts." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006). As discussed above, Defendants represented both in their communications to one another and in their warrant requests that Hart was required to register under SORA. Hart's status was the only basis to prosecute him and so was necessarily "material to the finding of probable cause." *Id.* As explained, Hart has plausibly alleged that this behavior was reckless.

The remaining element, participation by the individual defendants, is a question of fact informed by "[t]he totality of the circumstances." *Sykes*, 625 F.3d at 311 n.9. "Whether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions." *Id.* Our attempt to perform this fact-intensive analysis runs into the limitations discussed above. It is plausible that the prosecuting authorities were influenced by the representations and omissions in Parker and Rathbun's warrant requests, by Holtz's apparent ratification of Rathbun's representations, or by Wahtola and Leva's determinations in 2012 and 2013 that SORA covered Hart. These factual distinctions cannot appropriately be resolved by a motion to dismiss.

Turning to the second prong of the qualified immunity analysis, "the right to be free of continued detention without probable cause" has been clearly established in this circuit for decades. *Gregory*, 444 F.3d at 749–50. The principles that officers may not establish probable cause through "fabrication or failure to disclose," *see id.* at 750; *see also Coffey v. Carroll*, 933 F.3d 577, 590 (6th Cir. 2019), or rely on evidence they have reason to believe is unreliable, *Wesley*, 779 F.3d at 429–30, are likewise clear. A more granular analysis that compares the facts of this case to our malicious prosecution precedents must wait until the record on the factual scenario these officers encountered is developed.

### C. Defamation

Hart's last constitutional claim against the City and County Defendants is for defamation in violation of the Fourteenth Amendment. Hart alleges that, by virtue of his wrongful inclusion

in the public and law enforcement databases, he was subjected to humiliation, deprivation of liberty, and loss of employment.

This constitutional theory is grounded in the Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693 (1976), which sets out the so-called "stigma-plus" test. As we have summarized,

> the stigma-plus test is used to analyze a due process claim where the action taken by the state injures the plaintiff's reputation. "The frequently drastic effect of the 'stigma' which may result from defamation by the government . . . does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural due process protection of the Due Process Clause." A successful plaintiff must therefore show that the state's action both damaged his or her reputation (the stigma) and that it "deprived [him or her] of a right previously held under state law" (the plus).

*Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501–02 (6th Cir. 2007) (alterations in original) (quoting *Paul*, 424 U.S. at 701, 708). The Supreme Court later clarified that, although the stigma-plus test describes a species of constitutional injury, the plaintiff must still identify some process that he is due. *See Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[E]ven assuming, *arguendo*, that respondent has been deprived of a liberty interest [under *Paul v. Davis*, 424 U.S. 693 (1976)], due process does not entitle him to a hearing to establish a fact . . . that is not material under the Connecticut statute."); *see also Mich. Dep't of St. Police*, 490 F.3d at 502 ("The stigma-plus test is used to determine whether state action violates an individual's procedural due process rights.").

We begin with the liberty interest. Hart was listed on the sex offender registry even though, after the 2011 amendments, he was not a covered "offender." That listing results in reputational harm: "SORA brands registrants as moral lepers solely on the basis of a prior conviction." *Snyder*, 834 F.3d at 705; *see also id.* at 705–06 (noting that "sex offenders are . . . widely feared and disdained by the general public"); *Wright v. O'Day*, 706 F.3d 769, 773–74 (6th Cir. 2013) (holding that a plaintiff had standing to seek enforcement of a procedural requirement based solely on the injury of being classified as a child abuser). We have described the collateral consequences of the listing that "reach[] far beyond the stigma of simply being

identified as a sex offender on a public registry," including "trouble finding a home in which they can legally live or a job where they can legally work." *Snyder*, 834 F.3d at 698.

These restrictions might not pose a constitutional problem if the underlying representation to the public—that Hart was a "sex offender" within the meaning of SORA—were true. *See, e.g.*, *Mich. Dep't of St. Police*, 490 F.3d at 501–02. Hart committed a sex offense. But listing him in the SORA database represented to the public not only that he had committed that crime but also that he belonged in the category of "sex offenders" who were required to register. He did not. As noted by our sister circuits, *wrongful* classification as a sex offender implicates a constitutionally protected liberty interest under the stigma-plus test. *See Burgos Vega v. Lantz*, 596 F.3d 77, 81–82 (2d Cir. 2010) (collecting cases in support of the proposition that "wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest"); *see also Schepers v. Comm'r*, 691 F.3d 909, 914 (7th Cir. 2012); *Brown v. Montoya*, 662 F.3d 1152, 1169 (10th Cir. 2011).

But to make out a procedural due process claim, Hart must still identify some procedural flaw. *See Conn. Dep't of Pub. Safety*, 538 U.S. at 7; *Mich. Dep't of St. Police*, 490 F.3d at 502. He argues that he was "never afforded the opportunity to challenge his continued designation as a registered sex offender after July 1, 2011 when the 2011 amendments to the Michigan SORA became effective." Defendants do not respond to this assertion, and the district court made no findings on the point. Without the benefit of an initial determination by the district court or any developed argument on appeal, we are unable to decide in the first instance whether Hart received the process he was due or whether his right to that process was clearly established. Mindful that "we are a court of review, not first view," *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015), we leave the issue to the district court and the parties on remand. *See Schepers*, 691 F.3d at 917 (declining "to outline in any more detail what sort of process" was required in light of the flexible and particularistic nature of the due process inquiry).[8]

---

[8]The Dissent misconstrues our grappling with this claim as withstanding a motion to dismiss but, as is made clear in the Opinion, we only remand and afford the district court the opportunity to address the issue in the first instance.

We do note that with Hart's other constitutional claims, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay*, 601 F.3d at 650. Hart's complaint alleges that two of the County Defendants—Wahtola and Leva—required him to register, thereby publishing his (incorrect) status. Hart alleges that the remaining City and County Defendants—Parker, Rathbun, and Holtz—wrongfully, even recklessly, relied on that registration. But he does not implicate them in the publication itself.

On remand, Hart may pursue his defamation claim against Defendants Wahtola and Leva (and, to the extent found to be warranted, the other defendants who are not parties to this appeal). We dismiss the defamation claim against Parker, Rathbun, and Holtz.

### D. Municipal Liability

The Municipal Defendants also appeal the district court's refusal to dismiss the claims brought against them pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because municipalities are not entitled to qualified immunity, the claims against them should be resolved only if "the resolution of [qualified immunity] 'necessarily and unavoidably' decides" the case against the municipal defendants. *Vakilian*, 335 F.3d at 521 (quoting *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996)).

We have previously explained that, in certain unusual circumstances, a municipality might be liable for a constitutional violation even in the absence of a liable individual. *North v. Cuyahoga Cty.*, 754 F. App'x 380, 390 (6th Cir. 2018) (collecting cases and explaining that, "[i]n a subset of § 1983 cases . . . the fact that no individual defendant committed a constitutional violation . . . might not necessarily 'require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm'" (quoting *Epps v. Lauderdale Cty., Tenn.*, 45 F. App'x 332, 334 (6th Cir. 2002))). For example, if no official is responsible for compliance with a constitutional mandate, liability for a foreseeable violation of that mandate might lie not with the individuals (who bore no personal responsibility) but with the municipality (which failed to prepare its employees for the situation). As the Supreme Court put it, "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with

specific tools to handle recurring situations." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997); *see also Shadrick v. Hopkins County*, 805 F.3d 724, 739–40 (6th Cir. 2015).

After the 2011 amendments narrowed the category of individuals required to register under SORA, the Municipal Defendants were on notice that the sex offender registry contained individuals who were no longer subject to the Act. We have already held that "Michigan's SORA imposes punishment." *Snyder*, 834 F.3d at 705. Being listed in the sex offender registry "consigns [registrants] to years, if not a lifetime, of existence on the margins." *Id.* Even if the municipalities incorrectly assumed that errors would be caught before any wrongful arrests, prompt action was required to avoid inevitable wrongful listing—wrongful listing that itself implicates constitutional concerns, as explained above. The question that remains is whether the responsibility to undertake that prompt action lay with one or both of the Municipal Defendants.

Resolution of that question must await the proceeding below. If the district court determines that the municipalities failed to take reasonable steps to forestall wrongful listings, liability may exist for Municipal Defendants. If the district court determines that the wrongful arrest was foreseeable and that the municipality failed to prepare its officers for that foreseeable risk, municipal liability may result. *See Brown*, 520 U.S. at 409–10 ("The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable."). Because those issues are not necessarily and unavoidably resolved by the issues before us, they are entrusted to the district court.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decisions regarding the false arrest, malicious prosecution, and *Monell* claims, as well as the defamation claim against Wahtola and Leva; **REVERSE** the decision regarding the defamation claim against Parker, Rathbun, and Holtz; and **REMAND** for further proceedings consistent with this opinion.

---

### DISSENT

---

CHAD A. READLER, Circuit Judge, dissenting.   According to the complaint, the Michigan State Police, in conjunction with a retained private data firm, made a grave mistake. Michigan law put the State Police singularly in charge of the State's Sex Offender Registration database, with inferior law enforcement officials to rely upon the information stored therein.  *See* Mich. Comp. Laws § 28.728(1) (State Police "shall maintain a computerized law enforcement database of registrations and notices required under" SORA); Mich. Comp. Laws § 28.727(8) (State Police "shall promptly provide registration, notice, and verification information to . . . local law enforcement agencies").   Unfortunately, the State Police failed to update their database to account for a change in Michigan law that removed Anthony Hart's registration requirements.  As a result of that oversight, Hart was erroneously listed in the database as being subject to reporting requirements, erroneously instructed by the State Police to register with local officials, and thus erroneously detained by local officers in Hillsdale for failing to honor his registration commitments.  *See* Mich. Comp. Laws § 28.725a(1) (State Police shall notify individuals registered under SORA of their registration duties).   Similarly fooled by the State Police's error were the prosecutor, the state court, and even Hart's attorney.   Regrettably, Hart served 19 months in prison before the error was spotted by prison officials.

The gravity of this error is clear.   But so too should be the conclusion that the local Hillsdale officers (perhaps unlike the State Police) are entitled to qualified immunity.   Our cases absolve officers of liability where they rely upon information transmitted from other officers (in this case, superior officers).   And the majority opinion does not cite any clearly established law holding, "beyond debate," that the local officers should have second guessed their superiors in the State Police at the time of Hart's arrests.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In the absence of clearly established law supporting Hart, the majority opinion instead rewrites Hart's complaint, articulating a factual theory nowhere to be found in the complaint. The majority opinion manufactures a theory that the State Police database was historically poorly maintained and thus known by local officers to be error-laden, meaning it would have been

reckless for officers to rely on the database. While spread throughout the majority opinion, that theory is nowhere to be found in Hart's complaint (and the majority, tellingly, does not cite any allegation to that effect). That is no oversight on Hart's part; he took the same approach in related state court litigation. There too, the Michigan Court of Appeals explained, Hart "does not allege any such pattern" of the State Police choosing methods "that will cause violations of constitutional rights." *Hart v. State*, No. 338171, 2019 WL 488758, at *5 (Mich. Ct. App. Feb. 7, 2019) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). "Instead, plaintiff only alleges that his, and no one else's, constitutional rights were violated." *Id.* To the extent there could be any confusion on the point, we asked Hart's counsel for his view. And he *expressly disavowed* the majority opinion's theory of the case at oral argument:

| | |
|---|---|
| THE COURT: | You don't allege that there was a history of errors by the Michigan State Police more broadly in making, having problems with their database, do you? |
| COUNSEL FOR HART: | No. I don't. |

Oral Arg. Hr'g at 32:00, 32:08. It is quite something to say, as does the majority opinion, that because "there is no dispute that Hart alleges a claim for false arrest," we can assume *any* facts that *might* support such a claim, regardless whether a plaintiff has pleaded them, let alone disavowed them. Rule 12(b)(6) demands far more. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (eliminating notice pleading in favor of "plausibility" pleading).

Rather than rewriting the complaint, I would take it at its word. And doing so requires that we afford the local officers qualified immunity.

1. *The State Police SOR Database Was Authorized By Statute As An Authoritative Source To Be Relied Upon By Local Officers.* One might fairly expect a live dispute over whether the State Police violated any constitutional right owed to Hart. After all, its error, in conjunction with that of its private vendor, allegedly caused Hart to continue to register with local officials, registrations he admits he failed to honor. To that end, Michigan law charged the

State Police with the duty to operate the SOR database and notify offenders of their registration obligations:

> *Maintain the database:* The State Police "shall maintain a computerized law enforcement database of registrations and notices" required under SORA, with extensive information on registrants. Mich. Comp. Laws § 28.728(1).
>
> *Remove non-qualifying individuals from database:* If the State Police "determines that an individual has completed his or her registration period, including a registration period reduced by law" under the amendatory act that added this subsection, "*or that he or she otherwise is no longer required to register under this [A]ct, the [State Police] shall remove the individual's registration information from both the law enforcement database* and the public internet website within 7 days after making that determination." Mich. Comp. Laws § 28.728(9) (emphasis added).
>
> *Provide information to local governments:* The State Police shall provide local law enforcement agencies, sheriff's departments, and other entities "registration, notice, and verification information . . . ." Mich. Comp. Laws § 28.727(8).
>
> *Advise registrants:* The State Police are to advise by mail all individuals registered under SORA who are not in a state correctional facility of their duties under the Act, as amended. Mich. Comp. Laws § 28.725a(1).
>
> *Notify local authorities of a failure to register:* The State Police must notify all registering authorities and initiate enforcement action if individuals do not report as required in SORA. Mich. Comp. Laws § 28.725a(9).

Compare these significant, overarching responsibilities with the ministerial responsibilities placed upon local registering authorities like the Hillsdale officers. Local officers maintain subordinate, secondary duties, largely acting as conduits for passing information to the State Police. As local registering authorities, the officers collect certain clerical information and transmit it to the State Police to be added to the registration database, Mich. Comp. Laws § 28.725a(5), including a registrant's date of birth, employment and school information, telephone number and email address, as well as the registrant's fingerprints. Mich. Comp. Laws § 28.727(1). When a registrant reports to a local registering authority, an officer verifies the registrant's residence or domicile, matches the registrant's appearance with a database photo, and forwards the information to the State Police to update their database. Mich. Comp. Laws § 28.725a(5). The local officers also accept the registrant's registration fee and written documentation of employment, volunteer, or student status, as well as updates from the

registrant as to changes in residence, email addresses, or vehicle purchases, among other things. Mich. Comp. Laws §§ 28.724a(5), 28.725.

2. *Hart's Complaint Alleges That Local Police Were Expected To Rely Upon The State Police Database.*  With the Michigan Legislature having placed the primary registration and notification duties, as well as the sole duty for removing registrants from the database, upon the State Police, one would naturally expect registrants and local officials alike to rely upon such an authoritative source.  That is exactly what happened here, as the complaint reflects.  According to Hart, the State Police had a duty to maintain the SOR "so that it was reasonably accurate and reliable and likely not to result in the arrest and/or criminal prosecution of persons who were not properly and/or appropriately listed."  Second Am. Compl. ¶¶ 21, 40 ("By statute, the Michigan Legislature delegated the duty to accurately maintain the Michigan SOR, to the [State Police].").  Hart further alleges that any failure by the State Police to remove persons from the database was "likely to result in arrest, conviction and incarceration for non-existent crimes—i.e, without probable cause."  Second Am. Compl. ¶ 31.  Hart similarly alleges that Watch Systems LLC, a company hired by the State Police to help maintain the registry, "was on actual notice that officers relying on the registry software . . . would 'engage in arrests and initiate prosecutions that lacked probable cause, in reliance on the information obtained through [the database].'"  Second Am. Compl. ¶ 95(a), (b).

By these allegations, Hart acknowledges that local officers, working in a subordinate law enforcement agency, rely upon the State Police and its agents to maintain the database accurately, and that those local officers will make an arrest based upon registration information in the database.  Hart further acknowledges that it was the duty of the State Police, not the local officers, to inform Hart of his duties to register.  Hart followed the State Police's instruction each time he registered.

3. *The Local Officers Are Entitled To Qualified Immunity On All Claims.*  Qualified immunity is not just a right against trial; it is a right against the overall burdens of litigation where the violation of a clearly established right has not been alleged.  For that reason, qualified immunity should be granted "at the earliest possible stage in litigation."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  Any other

approach undermines the driving force behind immunity: to avoid subjecting public servants to unnecessary litigation, including unwarranted discovery. *Everson v. Leis*, 556 F.3d 484, 491 (6th Cir. 2009). We thus dismiss a claim brought pursuant to 42 U.S.C. § 1983 where a legal question underlying the claim can be resolved on the pleadings. *See, e.g.*, *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (resolving whether a gunshot victim was in custody while being treated in an ambulance); *Hughlett v. Romer-Sensky*, 497 F.3d 557, 563 (6th Cir. 2006) (resolving whether a statute created a private cause of action for untimely distribution of state benefits). The legal question posed here—whether officers act recklessly by failing independently to verify information in an authoritative police database—may also be resolved on the pleadings. Accepting as true Hart's factual allegations, the local officers acted reasonably in relying on the state database, and the lack of clearly established law to the contrary supports granting qualified immunity on Hart's claims. Taking Hart's claims in turn, each is legally flawed.

*False Arrest And Malicious Prosecution.* To establish a false arrest, Hart must allege facts that make it plausible the arrest lacked probable cause, in violation of the Fourth Amendment. *See Wesley v. Campbell*, 779 F.3d 421, 434–35 (6th Cir. 2015). A malicious prosecution claim, by comparison, looks not to the time of the arrest but to the time legal proceedings were initiated. *See Wallace v. Kato*, 549 U.S. 384, 390 (2007). For Hart's claims to proceed, then, he must plausibly allege that the local officers knowingly, deliberately, or recklessly made false statements to secure warrants against him (or to influence the decision to prosecute him), and that the officers' statements were material or necessary to a finding of probable cause (or to the decision to prosecute). *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).

1. As an initial matter, there was likely probable cause to arrest Hart. Probable cause exists where officers rely upon authoritative sources that turn out to be mistaken, whether the mistake is one of fact or law. *See Heien v. North Carolina*, 574 U.S. 54, 57, 62 (2014) (holding that both reasonable mistakes of fact and law can give rise to reasonable suspicion and, by implication, probable cause). In a similar case, we held that probable cause existed for an arrest for which no law had been violated. *Sinclair v. Lauderdale County*, 652 F. App'x 429, 438 (6th

Cir. 2016).  In *Sinclair*, a prisoner agreed to a consent order that set conditions on "furloughs" he could receive while undergoing court-ordered rehabilitation.  *Id*. at 431.  Upon any furlough, the prisoner agreed that his mother would transport him back to the rehabilitation facility; if he failed to return, he would be charged with "escape" or "failure to appear."  *Id*. (cleaned up).  During an ensuing furlough, the son returned to the facility without his mother.  Believing the facility had notified the sheriff, the son fled and "went into hiding."  *Id*.  The sheriff in turn arrested the mother, erroneously believing she had helped her son escape.  *Id*. at 432–33.  The mother spent 37 days in jail before the charges were dropped.  *Id*. at 433.

Invoking § 1983, the mother (now a plaintiff) argued that the Tennessee escape statute did not apply to her son because probation violations were expressly excluded from the statute, meaning there was no probable cause to arrest her.  *Id*.  But probable cause existed, we concluded, because "even if [the plaintiff's son] was on probation, [the sheriff's] mistake of law was not so unreasonable as to preclude probable cause for charging [the plaintiff] with escape."  *Id*. at 435 (citing *Heien*, 574 U.S. at 66).  Equally true, the "mistaken application of the unambiguous 'escape' statute" could also be classified as a "mistake of fact regarding [plaintiff's son's] probation status."  *Id*.  Conclusive in *Sinclair* was the other "probative evidence carrying the full weight of legal authority" the officers relied upon, including the consent order that warned of "escape" and "failure to appear" charges if the plaintiff's son absconded.  *Id*. (cleaned up).

Hart's arrest similarly was mistaken, both in law and fact, given the confusion over his registration requirement.  And as *Sinclair* demonstrates, it was not clearly established—even as of 2016—that a mistake about a person's status made in reliance upon apparently authoritative sources defeats probable cause.  As in *Sinclair*, the local officers here relied upon "probative evidence carrying the full weight of legal authority."  *Id*.  True, as the majority opinion notes, Hart was not subject to a consent order.  But neither was the plaintiff in *Sinclair*.  Her son was the subject of and the signatory to the consent order.  *Id*. at 431.  And even if she were, one does not become subject to an inapplicable criminal statute merely by consent.  All told, Hart's arresting officers—even more so than that in *Sinclair*—relied upon the entity with the singular legal authority as to registration requirements.  If there is no duty to question an order that

merely describes a hypothetical future charge for a different party, why would officers be required to question the singular authority over Hart's registration requirements?

In the exclusionary rule context, the Supreme Court has likewise indicated that probable cause may exist where an officer makes an arrest based upon another police agency's "bookkeeping error" in a database. *Herring v. United States*, 555 U.S. 135, 137–39 (2009). The officer in *Herring*, upon being told by his local dispatcher of an active warrant in a neighboring jurisdiction for the plaintiff's arrest, arrested the plaintiff. *Id.* at 137–38. Yet the warrant had been recalled months before; its continued inclusion in the neighboring police database was in error. *Id.*

*Herring* mirrors this case. Like here, the arresting officer in *Herring* could have waited for further inquiries before making the arrest, rather than fully relying upon another police agency. Nonetheless, "[w]hen a probable-cause determination [i]s based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation. The very phrase 'probable cause' confirms that the Fourth Amendment does not demand all possible precision." *Id.* at 139. The Supreme Court further noted that, "whether the error can be traced to a mistake by a state actor or some other source may bear on the analysis." *Id.* In *Herring*, the Supreme Court affirmed the denial of the defendant's motion to suppress evidence because the arrest not did result from reckless or even grossly negligent conduct, nor was the conduct "recurring or systemic negligence." *Id.* at 144. The same is true here.

The majority opinion finds an absence of probable cause because Hart was "effectively homeless," meaning he had no home to register. Maj. Op. at 12. Of course, the phrase "effectively homeless" is not one used in Michigan law. One is either homeless or not. Nor, in any event, does Michigan law exempt homeless persons from SORA reporting requirements. All Michigan sex offenders with registration requirements, including those in the homeless community, are required accurately to report either their residence or domicile. *People v. Dowdy*, 802 N.W.2d 239, 251 (Mich. 2011). A domicile is the "place" where one is staying, with an intent to return, something that everyone, the homeless included, have as a matter of Michigan law. *Id.* at 246–47. And a residence could include a vacant house, a park, or any other

place at which one "habitually sleeps, keeps his or her personal effects, and has a regular place of lodging." *Id.* at 245 (quoting Mich. Comp. Laws § 28.722(g)). For Hart, that would have been the tree house he alleged to have stayed in for some time, located in the backyard of an address near the one Hart erroneously reported.

To be sure, the State Police, as part of their broad SORA compliance duties, do have authority to exempt certain homeless persons from reporting a specific domicile or residence. But to have qualified for that exception, Hart would have needed to appear at the local registering authority to register "123 Homeless" as his address. *Id.* at 247–48. Hart did not do so. Rather, he recorded his address as 79 Budlong. And, he adds, his actual address was 76 Budlong, thereby giving local officers a reasonable basis to believe Hart failed to honor his reporting requirements.

2. Even in the absence of probable cause, the officers' conduct does not meet the high bar of recklessness. Recklessness is more than gross negligence; it is the conscious disregard of a known risk. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007) (explaining that recklessness is "a known or obvious risk that [is] so great as to make it *highly probable* that harm [will] follow" (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34 (5th ed. 1984) (emphasis added)). Hart's allegations do not even approach this level of culpability. It was not unreasonable for the local officers to rely on the authoritative State Police registry, especially where Hart himself did not dispute his registration duty and continuously registered at the direction of the State Police.

So the majority opinion manufactures an obligation to verify the work of the State Police. It reads SORA to "contemplate[] an independent obligation on the part of enforcing officers to check for satisfaction of SORA's requirements prior to arrest." Maj. Op. at 12. But what in state law backs that assertion? Certainly not the language that an officer may "[s]eek a warrant for the individual's arrest if *the legal requirements for obtaining a warrant are satisfied*." Mich. Comp. Laws § 28.728a(1)(d) (emphasis added). That language adds little to the debate. After all, no warrant should ever issue where the "legal requirements for obtaining [the] warrant are [not] satisfied." At most, this statutory language simply begs the question whether, on the facts alleged, a reasonable officer would conclude those requirements were satisfied. No doubt he

would, given the information in the database, the fact that Hart continued to register, and the fact that Hart was residing at an unregistered address. Had the Michigan Legislature intended to place a heightened responsibility on local officers independently to research SORA's requirements to verify instructions from the State Police, it would have said so expressly. Instead, the Legislature assigned local officers with run-of-the-mill recording and reporting obligations.

The majority opinion's "verify the work of one's superiors" requirement is thus not only ungrounded in state law, but it is also entirely impractical and at odds with direction from the Supreme Court. Police officers must be able to "act on directions and information transmitted by one officer to another"—they "cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley*, 469 U.S. 221, 231 (1985) (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (1976)); *see United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014). Officers are thus generally shielded from liability by qualified immunity where, for example, they rely on instructions or information coming from a police dispatcher. *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003). At worst, the officers here were negligent in not independently investigating Hart's legal status. But the majority opinion identifies no state or federal rule that required them to do so.

3. Nor, at all events, did the officers violate any purportedly clearly established constitutional right. Hart must fairly allege a constitutional right defined by then-existing precedent that is "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citing *Reichle v. Howards*, 566 U.S 658, 666 (2012)), thus putting the question "beyond debate." *Ashcroft*, 563 U.S. at 741 (citations omitted).

The majority opinion's first salvo is to say this case is not suitable for resolution at the motion to dismiss stage. To be sure, at this stage we must assume Hart's allegations as true. But even then, Hart is not absolved of his duty to plead facts that, when assumed as true, would be sufficient to state a claim for which relief may be granted. True, *Wesby* was decided past the Rule 12(b) stage (and in the officers' favor, it should be noted, on the issue of qualified

immunity).  *Wesby*, 138 S. Ct. at 590–91.  But that does not mean cases can never be resolved then, especially one (like Hart's) that turns on a straight-forward legal question.

Perhaps, as the majority opinion next contends, "there does not have to be a case directly on point" to overcome qualified immunity.  If so, Hart typically must still identify a "body of relevant case law" squarely aligned with his Fourth Amendment-inspired legal theory.  *Wesby*, 138 S. Ct. at 590.  The majority opinion says that body of law is exemplified by *Bunkley v. City of Detroit*, 902 F.3d 552 (6th Cir. 2018).  But *Bunkley* turned on instances of repeated, intentional misconduct, something the majority opinion acknowledges Hart has not sufficiently alleged.

*Bunkley* is nothing like today's case.  There, a shooting victim told detectives she had been attacked by two black men in their 20s, wearing black clothing.  *Id.* at 556. One, she explained, was a dark-skinned male who likely was injured when she returned fire.  *Id.* The other, she said, had a medium build and light skin.  *Id.*  That same evening, the detectives also visited a local hospital to investigate the shooting of Charles Knox, a 47-year-old, light-skinned black male who had been shot in both legs.  *Id.*  When Knox's 22-year-old son, Derrick Bunkley, heard of his father's shooting, he rushed to the hospital, dressed in black.  *Id.* at 556.  The detectives happened to encounter Bunkley at the hospital, at which point they arrested him on the suspicion that he and his father were the perpetrators of the assault on the female shooting victim.  That suspicion, however, was based on nothing more than the fact that Bunkley was a black man, in black clothes, with a wounded father.  The detectives did not bother to inspect the crime scene where Knox had been shot, did not take a statement from Knox, and did not talk to Knox's doctors, who could have confirmed that Knox had been shot in each leg (the female victim had reported possibly hitting the assailant with "a [single] gunshot").  *Id.* at 556–58.

The detectives' policework was abhorrent.  They arrested Bunkley despite him telling the officers that, through social media and other forensic evidence, he could prove he was home at the time of the shooting.  And they did so despite the fact that Knox was nearly 50 and light-skinned, not a dark-skinned twentysomething, the description given by the shooting victim.  *Id.* at 556–57.  What is more, after the arrests, the lead detective made a series of statements to the prosecutor she knew to be false, testified falsely, and then personally assisted the prosecutor at

trial.  *Id.* at 557.  Bunkley was convicted of assault with intent to commit murder and spent nearly two years in prison before his obvious innocence was confirmed by forensic testing.  *Id.* In a subsequent civil rights action, the detectives claimed to be "simply following orders" from a sergeant who, they said, authorized the arrest.  *Id.* at 561–62.  But the sergeant did so only after the detectives requested that authorization.  *Id.* at 556.  And the detectives surely knew better at the time.  They had conducted the investigation and ignored both Bunkley's alibi as well as obvious, patent contradictions between Knox's appearance and the description of the shooter given by the female victim.  *Id.* at 556, 561–62.

All of that is a far cry from what happened to Hart.  The officers in *Bunkley* failed to take notice of obvious physical evidence that could have easily confirmed Knox was not a suspect; Hart alleges no such patent contradiction.  Bunkley protested his innocence and offered proof of an alibi; Hart admitted guilt and thought he had violated SORA.  Bunkley's (and Knox's) innocence was readily apparent.  Yet Hart's innocence could only be determined by looking specifically to the SOR entries (one of a host of items possessed by the officers), pulling up required information, calculating Hart's age at the time of his more-than-a-decade-old conviction, cross referencing that information against Michigan law, and then independently determining that Hart was not required to register—even though Hart and the State Police said that he was.  *Bunkley* may stand for the proposition that officers cannot blatantly ignore facts and fail to undertake any investigation, only to later point fingers at an unsuspecting commanding officer.  But that hardly equates to an instruction that every officer, from that point forward, must double check information in a State Police database.

It makes no difference that the officers relied upon the State Police's database rather than, as the majority opinion frames the matter, having been told directly by those superior officers "that Hart was subject to SORA and had violated its registration requirements."  Maj. Op. at 11. Communications through the database are authoritative—state law requires the database be made available to local officers to do their work.  And Hart, of course, did not dispute the database information either.  Rather, in accordance with the commands of the State Police, Hart submitted his registration information to the local registration officers, information those officers had at the time of Hart's first arrest.  While the State Police apparently erred in how it maintained Hart's

information, and thus erred in requiring Hart to register, it is far from *reckless* for local officers to accept that process as valid.

Nor, for many of these same reasons, does the complaint accord with the majority opinion's suggestion that the local officers may not have been "relying on [the State Police's] affirmative representations." Maj. Op. at 11. Here again, the majority opinion rewrites the complaint. Hart is the master of his complaint. *Roddy v. Grand Trunk W. R.R., Inc.*, 395 F.3d 318, 322 (6th Cir. 2005). In it, he makes clear it was the errors in the database operated by the State Police and its agent Watch Systems that "caus[ed Hart's] subsequent constitutional deprivations." Second Am. Compl. ¶ 46. Absent those errors, Hart would not have been arrested. The State Police and its agent, Hart explains, failed "to properly act," meaning that "Hart was never properly flagged or removed from the SOR, resulting in Hart's multiple wrongful arrests, prosecutions, convictions, and extended incarceration for failure to register, when in fact, he was not legally required to register." Second Am. Compl. ¶ 106. This combination of errors resulted in local officers improperly detaining Hart. In Hart's words, "[a]s a proximate result of" the State Police's errors, "Hart was subjected to false arrests and malicious prosecution, on more than one occasion, in violation of his constitutional rights." Second Am. Compl. ¶ 45. As to whether the State Police's representations caused his arrest, I would take Hart's word on the matter rather than that of the majority opinion.

As Hart's counsel acknowledged at oral argument, the local officers' reliance on the State Police database was "reasonable." Oral Arg. Hr'g at 32:56. So even if, as counsel also argued, the officers could have (and thus should have) conducted an independent review of the database information, failing to do so plainly was not recklessness.

*Due Process Defamation.* Nor do I see a basis for a "stigma-plus" defamation claim against the officers. A stigma-plus claim requires more than mere defamation—there must be the deprivation of some additional substantive right provided for in state or federal law—the "plus" factor. *See Paul v. Davis*, 424 U.S. 693, 701 (1976). Hart's theory is that publication of his name on the sex offender registry constitutes defamation, and that the deprivation of his liberty and malicious prosecution establish the stigma and the "plus." Appellee Br. at 36–38. We analyze such claims under procedural due process. *See Does v. Munoz*, 507 F.3d 961, 966

n.1 (6th Cir. 2007) (citing *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 502 (6th Cir. 2007) ("Our review of the caselaw has failed to identify any case that applies the stigma-plus test to a substantive due process claim.")).

Hart has not alleged a procedural defect. Because a stigma-plus claim arises as a matter of procedural due process, "the availability of adequate process defeats" the claim. *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006). Equally true, where a plaintiff has process available yet fails to pursue that right, he cannot allege a due process violation. *See Quinn v. Shirey*, 293 F.3d 315, 321–22 (6th Cir. 2002). These bedrock requirements doom Hart's claim. First of all, process was made available to him. Hart went through the full judicial process before each of his convictions; he pleaded nolo contendere in the first proceeding and guilty in the second for failing to properly register. Hart was also the subject of post-conviction proceedings during which his convictions were vacated. Second of all, Hart had another legal avenue available to him—he could have (but did not) challenged his continued designation as a registered sex offender. Michigan law afforded a hearing to anyone who, like Hart, was no longer required to register after the 2011 SORA amendments. Mich. Comp. Laws § 28.723a.

The majority opinion excuses these cavernous holes in Hart's defamation theory by crediting Hart's assertion in his appellate brief that he was "never afforded the opportunity to challenge his continued designation as a registered sex offender after . . . the 2011 amendments . . . became effective." Appellee Br. at 39 n.17. But Hart did not make that assertion in the district court, which alone dooms the claim. Nor, once again, does the majority opinion's reasoning align with the complaint. Hart could not have been denied an opportunity to challenge his registration requirement when, as he alleges in his complaint, he was unaware he had no duty to register in the first place. According to Hart, it was the Department of Corrections who discovered the error once Hart was imprisoned. And once the error was discovered, Hart was promptly afforded further process—a circuit court judge vacated his convictions.

It may be, as the majority opinion observes, that discovery would reveal more about what process Hart was afforded. But Hart does not need discovery to know what opportunities were afforded to him. Among other things, he remembers the nature of each plea and the charges.

Yet he has not alleged any procedural defects. In the absence of factual aversions that can survive a motion to dismiss, Hart's complaint fails to state a constitutional violation.

For these reasons, I would grant Defendants qualified immunity on all claims.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 18-1305/1307

ANTHONY HART,

    Plaintiff - Appellee,

    v.

HILLSDALE COUNTY, MICHIGAN, KWINN LEVA, TIMOTHY PARKER, and CHRISTINE WAHTOLA (18-1305); CITY OF HILLSDALE, SHELBY RATHBUN, and TODD HOLTZ (18-1307),

    Defendants - Appellants.

> **FILED**
> Sep 03, 2020
> DEBORAH S. HUNT, Clerk

Before: COLE, Chief Judge; STRANCH and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk